David D. Lin, Esq.
david@iLawco.com
LEWIS & LIN, LLC
45 Main Street, Suite 608
Brooklyn, NY 11201
Tel: (718) 243-9323
Fax: (718) 243-9326

*Counsel for Plaintiff Carly Avraham*

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| CARLY AVRAHAM,<br><br>                              Plaintiff,<br><br>        v.<br><br>SPENCER GOLDEN a/k/a PETER CALDERON and SARAH MCCLATCHY,<br><br>                              Defendants, | Case No. 2:18-cv-11795<br><br><br>**COMPLAINT** |

Plaintiff, Carly Avraham (hereinafter "Plaintiff" or "Carly"), sues Spencer Golden a/k/a Peter Calderon ("Defendant Golden" or "Mr. Golden") and Sarah McClatchy ("Defendant McClatchy" or "Ms. McClatchy") (collectively with Mr. Golden, "Defendants") and states as follows:

### STATEMENT OF THE CASE

1.      Plaintiff brings this action pursuant to the federal Copyright Act (17 U.S.C. § 501 et seq.), Florida Statutes Section 784.0485, and common law for tortious interference, intentional infliction of emotional distress, intrusion upon seclusion, and the malicious, willful and unlawful publication in this District of false, misleading, disparaging and defamatory statements by Defendants regarding Plaintiff.

2.      Plaintiff Carly Avraham is a resident of New Jersey and a career CT Technologist.  Since August 2015, she has been in a committed relationship with her girlfriend, Jenny Sorensen (hereinafter, "Jenny").

3.      Defendant Golden is a resident of Florida and Jenny's former boyfriend.  Since their relationship ended in July 2015, Defendant Golden has undertaken a sustained course of conduct to harass, intimidate, defame, intrude upon the privacy of, and inflict emotional distress upon the Plaintiff, while periodically attempting to win back Ms. Sorensen's affections.  These deliberate attacks on Carly's reputation, privacy and emotional well-being continue to the present.

4.      Specifically, Defendant Golden has: 1) engaged in a campaign of disinformation online in order to defame Plaintiff, injure her professional reputation and publicize private facts about her, including her sexual orientation; 2) taken photos from Plaintiff's Facebook page and used them as part of his cyber harassment campaign, thereby infringing upon her copyright; 3) directly contacted her employers to accuse her of systematic regulatory violations, all with the deliberate goal of getting her fired; 4) paid or otherwise persuaded Defendant McClatchy to take part in further defamation and tortious interference against the Plaintiff.

5.      In assistance to Defendant Golden, Defendant McClatchy has made knowingly false accusations of professional misconduct against Plaintiff.

6.      As a result of Defendants' misconduct, Plaintiff has been and continues to be substantially and irreparably harmed.  Over the course of three years, she has been fired from two different jobs and lost opportunities for countless other positions.  She has been forced to leave her former residence in Florida.  She has had her privacy violated with a spate of

completely fabricated online reviews, commentary and pseudo-journalism.  She has been compelled to remove all her social media profiles for fear of being targeted online.  She has seen her friends and relatives contacted directly with defamatory and humiliating accusations about her.  She has been the target of a continuous effort to destroy her career, to harass and intimidate her, and to inflict severe emotional distress upon her.

## THE PARTIES

7.      Plaintiff Carly Avraham ("Carly") is an individual domiciled in Morris County, New Jersey.

8.      Defendant Spencer Golden, also known as "Peter Calderon," ("Defendant Golden") is an individual domiciled in Florida.

9.      Defendant Sarah McClatchy ("Defendant McClatchy") is an individual domiciled in Pennsylvania.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this cause pursuant to 28 U.S.C. §§ 1331 because this case arises under the Copyright Act (17 U.S.C. § 501 et seq.). Additionally, this Court has subject matter jurisdiction based upon diversity of citizenship and an amount of controversy greater than $75,000, per 28 U.S.C. § 1332.

11.      This Court has pendent jurisdiction of the related state and common law claims asserted in this action pursuant to 28 U.S.C. § 1367 because they involve the same parties, they arise from the same operative facts common to the causes of action arising under the federal claims, and because the exercise of pendent jurisdiction serves the interests of judicial economy, convenience and fairness to the parties.

12.      This Court has personal jurisdiction over Defendants because they have

specifically targeted a New Jersey resident and have caused injury to person and property within the state of New Jersey.

13.     Venue is proper in this Court pursuant to the provisions of 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to the claims and the threatened and actual harm to Plaintiff occurred in this district by reason of Defendants' conduct as alleged below.

## FACTUAL ALLEGATIONS

14.     Plaintiff formerly resided in Florida, where she was hired in June of 2014 as an MRI/CT Technologist with Elite Imaging, LLC ("Elite Imaging").

15.     In May 2015, the Carly met Jenny Sorensen ("Jenny").  Carly was seeking a Personal Trainer and was put in touch with Jenny through a mutual friend.  Carly retained Jenny and began training with her on a regular basis.

16.     Carly and Jenny quickly developed a social relationship.  On two occasions in June 2015, Jenny introduced Carly to her boyfriend at the time, Spencer Golden, the Defendant ("Defendant Golden").

17.     In July 2015, Jenny decided to terminate her relationship with Defendant Golden after several disputes.

18.     Jenny was co-habiting with Defendant Golden at the time, but asked him to move out of the condominium they shared.

19.     Around this time, Carly and Jenny's relationship became romantic.

20.     On numerous occasions, Defendant Golden visited the condo unannounced. On at least one occasion, Jenny and Carly were in the condo and a confrontation ensued.

## Initial Threats and Harassment

21.     In the months that followed Jenny's break-up with Defendant Golden, both Jenny and Carly began to regularly receive distressingly incoherent and sometimes threatening communications from Defendant Golden.

22.     In various conversations with Jenny, Defendant Golden implored her to break ties with Carly, consistently referring to her as "the lesbian," often deriding Carly for her physical appearance, her Jewish ethnicity, and her sexuality.

23.     Ultimately, he began threatening to interfere with Carly's professional life.

24.     For example, in one exchange of text messages between Defendant Golden and Jenny on October 27, 2015, Defendant Golden, "Go eat the pussy of that ugly fucking fat whore," then, "Last thing, you just made it 10 times worse for your girlfriend." Later that night he wrote "And btw that's one ugly lesbian bitch trying to look not ugly on fb." Again, hours later, he wrote, "433 noticed going out tomorrow to all hospitals and xray centers alerting them to your gf being under investigation."

25.     Carly and Jenny took these threats seriously, as they were aware that Defendant Golden already had a lengthy criminal record, including a federal indictment for conspiracy to commit wire fraud.  Upon information and belief, Defendant Golden had been the principal organizer of a fraudulent scheme related to the online sales of prescription medicine, as well as another scheme to defraud job-seekers online.

26.     Carly and Jenny knew that Defendant Golden maintained numerous aliases and pseudonymous email addresses, and was skilled at maintaining false identities and manipulating internet searches to create the appearance of legitimacy.

**The Defamatory Fliers**

27.     In November 2015, Carly was contacted by a stranger on LinkedIn, who

informed Carly that she had received a flier that accused Carly of various misconduct.

28.     After looking further into the matter, Carly found out that a flier had been printed and sent to various radiology clinics in her area and beyond. The flier read: "TO ALL HOSPITALS AND IMAGING CENTERS: THIS RADIATION TEC IS UNDER FEDERAL INVESTIGATON FOR MULTIPLE HIPAA VIOLATIONS.  CARLY BROOKE AVRAHAM. HIRE THIS TEC AT YOUR OWN RISK."  The flier included a picture of Carly, taken from her Facebook page, as well as her personal email address. A picture of the flier is attached hereto as Exhibit A.

29.     The claims made in the fliers were false: Carly had never been accused of, much less engaged in, any violations of HIPAA (the Health Insurance Portability and Accountability Act).

30.     Defendant Golden scripted and caused to be disseminated the fliers as part of an intentional, malicious and systematic campaign to interfere with Carly's contractual relationships current and prospective employers, by leading them to believe that she was untrustworthy, was subject to regulatory scrutiny, and/or that she had engaged in unprofessional and/or impermissible conduct in the workplace.

### The First Tortious Interference (with Elite Imaging)

31.     In November 2015, Carly's supervisor at work called her into a meeting.  She was told that the company had been contacted by an attorney representing an anonymous client (who was, in fact, Defendant Golden).  The letter stated that the client had incidentally found a medical logbook and wanted to return it.  The letter also accused Carly of taking the logbook and deliberately breaching patient confidentiality.  The letter insinuated that the client was considering reporting the alleged breach to the authorities. The letter stated it was from a client

of Elite Imaging.

32.     The claims made in the letter were false.

33.     Moreover, the letter obscured the true intentions of the attorney's unnamed client, Defendant Golden, which was to harass Carly, interfere with her professional life, and cause her severe emotional distress.

34.     Defendant Golden scripted and caused to be disseminated the above-referenced statements as part of an intentional, malicious and systematic campaign to interfere with Carly's contractual relationships current and prospective employers, by leading them to believe that she was untrustworthy, was subject to regulatory scrutiny, and/or that she had engaged in unprofessional and/or impermissible conduct in the workplace.

35.     Carly's employer informed her at this same meeting that she was being terminated as a result of this incident.

36.     Carly protested that she had a cyberstalker (Defendant Golden) who had threatened to ruin her career and reputation, but to no avail.

37.     At one point, on November 17, 2015, Jenny tried pleading with Defendant Golden on Carly's behalf, asking, "What do I have to do so you don't ruin Carly's career or break her legs from you.  Do you remember that? You said cut all ties with her and I will pretend she never existed."  Defendant Golden's lengthy response included, "if you loved the lesbian [Carly] you would never have made her a target for me."

38.     In subsequent emails, Defendant Golden taunted Jenny about his tortious interference.  On November 21, 2015, he wrote: "the lesbian can buy you a new Mercedes, maybe an S5 50.  Oh but I forgot she won't have a job soon that may not be such a good idea."

39.     Carly subsequently tried to collect unemployment insurance but her former

employer contested the claim, arguing that she had been terminated for misconduct.  After an appeal to the Florida Department of Economic Opportunity Reemployment Assistance Program, an Appeals Referee ruled in Carly's favor, concluding that "the employer did not provide credible evidence to show the claimant was involved in the theft or removal of the logbook, or culpable for the theft or removal of the logbook by someone else . . . the claimant's actions that led to the separation do not meet the definition of misconduct as outlined above."

40.     In an email dated November 21, 2015, Defendant Golden admitted his involvement and his malicious intentions.

41.     In the email, Defendant Golden stated: "lets call it my hippa [sic] complaint, the main reason for the hippa [sic] complaint and the years of problems it will bring is this: she violates people at will with no respect for anybody or anything."

42.     Over a year later, in an email between Carly, Jenny and Defendant Golden dated November 18, 2016, Defendant Golden also admitted that he took the logbook from Jenny's condo.

**<u>Online Harassment and Intrusions</u>**

43.     Carly attempted to find another job for over three months, with little success. Upon information and belief, the fliers had been widely disseminated to radiology businesses in the area.

44.     In the months that followed, out of concern for her reputation, Carly began running Google searches of her name online.  She found numerous online posts and blogs that repeated false and defamatory allegations about her.  Nearly all of the content was posted by anonymous users with a variety of usernames, but had clearly been authored by Defendant Golden, as they mirrored the vague accusations of "HIPPA" violations.

45.     The overall effect of these posts was such that anyone who entered "Carly Brooke Avraham" and/or "Carly Avraham" into Google would receive a full page of various results referring to her "fraud" or "scams".

46.     Taken together, the sudden appearance of this corpus of online defamation was part of a deliberate campaign on the part of Defendant Golden to cause reputational harm and severe emotional distress to Carly.  They accused her of various crimes, mocked her sexuality, and included infringing photographs of her taken from her Facebook page.

47.     Defendant Golden or someone acting at his direction had skillfully engineered the defamatory content to manipulate Google algorithms and to appear organic.  In some cases an irrelevant post would be made on an obscure website by someone with usernames like "Carly Brooke Avraham Drug Selling" or "Carly Brooke Avraham Scam."  A YouTube video was posted by Defendant Golden with the caption "Carly Brooke Avraham is a scammer & a fraudster, she preys on weak by selling fake drugs.  She is a wretched pitiful lesbian and always complaining about her job and money…"

48.     Other content was clearly drafted by Defendant Golden in the style of 'fake news.'  A different YouTube video published on April 11, 2016, had the caption:

> "Carly Brooke Avraham also known as Carly Avraham a Florida-based health system professional may be in some serious HIPAA hot water after one of its employee reportedly leaked and allegedly sold over 900 medical records for patients who sought treatment at a Weston based imaging center. It is alleged that Dr. Mark Zhuk of Elite Imaging, LLC of Weston, Florida and Carly Brooke Avraham, a technician, conspired to sell confidential patient information for more than more than 900 patients. Elite Imaging, MAZ 18 LLC and enforcement agency is studying and a copy of the complaint details all of the violations of federal statute.  The OCR has a record of strict compliance and violators can be fined up to $50,000 per violation. Both Elite Imaging and Carly Brooke Avraham

are bound by the federal law and thus liable for HIPAA privacy and security violations. The State Of Florida Department Of Health also may investigate and place all licenses of all parties involved in suspension. Jackson Memorial Hospital had no comment on at the time of this article. HIPAA violation fines involving cases of willful neglect can reach $50,000 per violation, with a $1.5 million annual maximum. As far as Elite Imaging LLC is concerned, nobody at their office was aware of the investigation or accepted responsibility for the massive violations. "There is no investigation and we are not aware of any allegations and Ms. Avraham still works here". If an Elite Imaging/Dr. Mark Zhuk employee did provide these medical records to the public without consent, this would constitute a massive case of violation of HIPAA. And it wouldn't be Dr. Mark Zhuk's and Elite's first HIPAA breach, according to data from the U.S. Department of Health and Human Services.

49.     Carly also found articles and blog posts about her in obscure "consumer review" and quasi-news sites.  A post on the site "Ripoff Report" by Defendant Golden reads:

**Carly Brooke Avraham The Crook| She released my personal information to other. This is a HIPPA Violation**

Carly Brooke Avraham works in a Medical Imaging And Radiology center In South Florida. I have been suffering from chronic pain & doctors ordered me couple of test & I went there, the acting personnel was Carly Brooke Avraham. I went there couple of times & gone through couple of test. Their service is very poor. I had to wait long time to get an MRI & I knew this test itself time consuming. So, they had all the data about me & the worst thing is that couple of days ago I found out that Carly Brooke Avraham disclosed my data to someone else, which is really gross & It's a sheer violations of code & conduct.

50.     Nearly all of this web content had the telltale misspelling of HIPAA (Health Insurance Portability and Accountability Act of 1996) as "HIPPA", further indicating Defendant Golden as the source of the defamatory and harassing content.

51.     As if to ensure that his online harassment and defamation was having the desired effect, Defendant Golden or his agents also used fake online identities to contact Carly's relatives, thereby intruding on Carly's solitude and private affairs.  These communications accused Carly of crimes and "outed" Carly as a lesbian to several relatives.

52.     On Dec. 14, 2015, Natalie Avraham ("Natalie"), Carly's cousin and roommate, was contacted on Facebook by Defendant Golden posing as a user named "Chris Morris."  The message read:

> Ms. Avraham,
>
> My name is chris morris, I am a blogger and I have been covering a story on your sister about the hipaa.   My employer requires that I make all attempts to get my stories and posts accurate.  2 people that I have interviewed have stated that your sister has been selling pills.  She is seen on her fb page with a blonde woman and we are investigating her now.
> Would you like to comment?

53.     Natalie was skeptical.  She notified Carly and did not respond.

54.     Despite the lack of response, "Chris Morris" continued sending messages and quickly revealed that he was more interested in harassing and/or defaming Carly and her relatives than in any sort of journalism.

55.     Later on December 14, 2015, "Chris Morris" wrote:

> I blog for complaintsboard.com
> If you care to read my post.
> Or do a google search for carly avraham.

56.     The messages continued on at length.  In a subsequent message the same day, "Chris Morris" wrote, "I had a girl who has a history with Avraham tell me she is gay and gets her pills from a family member who works at a hospital."  Natalie, a nurse who works at a

hospital, was terrified that the online campaign of defamation and harassment would spread to her.

57.     On December 16, 2015, "Chris Morris" wrote:

> Hi Natalie,
>
> Our investigator was at cypress unit.  You lived there, jenny lives there now and we have had massive confirmation she is a lesbian.  "The masculine one with the mercedes."  We assume jenny is a lesbian.  Two lesbians selling drugs is where I want this story to go.  I will keep you out of the story.  Just tell me what you know.
>
> I interviewed a woman who does not like carly.  She said you are supplying drugs to carly for sale.  I require one person to confirm that before I am permitted to report and blog that.
>
> Please feel free to comment.

58.     Numerous other people close to Carly were contacted by "Chris Morris," via rambling social network messages, asking them if they could comment on his "story" about Carly Avraham and her "lesbian drug selling conspiracy."  They also mentioned Defendant Golden, describing him as a "war hero," a "credible source" and a "a scary guy."

59.     The entire online campaign of defamation and taunting harassment had the desired effect: Carly was embarrassed, ashamed, scared and professionally compromised.

60.     Jobless and deeply shaken, Carly ultimately decided to move to New Jersey in April 2016, where she hoped for a fresh start and to evade the harassment she was enduring.

**False and Deliberately Distressing Offers to Help**

61.     Jenny reached out to Defendant Golden to once again confront him about the online campaign.  On March 4, 2016, he replied, "It's not complicated.  The lesbian stole a ton of records.  I filed a complaint.  Reporters have sources and found it.  They interviewed and wrote

on the subject."

62.      Later, upon hearing that a few of the "bloggers" had reached out to Jenny and her friends or family, Defendant Golden attempted to exercise leverage over Jenny, claiming on March 7, 2016 that his lawyer could stop the harassment: "Please send me what you're seeing and I'll have my lawyer put an end to it.  We already came to an agreement that they would not publish anything on u."

63.      Later, in a text message sent April 5, 2016, to Jenny, Defendant Golden wrote: "We stopped the series of articles involving the cousin you told me about and her and frankly they should all be very grateful to you.  The stuff that's there will go away soon enough.  Or we can hire a firm there are plenty of them out there to make it go away fast and I have not given up I'm having these guys do something about it and you are my priority."

64.      In a text message sent April 20, 2016, Defendant Golden wrote, "The web was an unintended thing.  I didn't plan for that.  I didnt forsee it.  We can do our best to fix it.  It will pass.  Let me make some money and ill spend what it takes.  Ill search hi and low for the best guy."

65.      In the above-referenced text and various other communications, Defendant Golden claimed to have paid a retainer to a "reputation consultant" to help remove the various defamatory statements from the internet.

66.      After Carly got in touch with the so-called "consultants" and exchanged numerous emails, it became clear that it was merely another one of Defendant Golden's cruel games.

67.      The "consultants," who claimed to be British, were just more online personas created by Defendant Golden or one of his associates to toy with Carly, sending her random

inquiries in an ersatz British manner.

68.    After becoming convinced that the "consultants" were actually just Defendant

Golden, Carly stopped responding, but the emails persisted.

69.    For example, on Friday, July 28, 2017, "Benjamin Willis" from the email

address "Webandtechpros@mail.com" wrote:

> Lass,
>
> I took the money from you and your friend Spencer. I have
> been a leading crusader against these brutes and I have tried
> to help you.
>
> I got yelp to take down their post. My assistant has a screen
> shot and I will send it if you fancy having it.
>
> Cherio

70.    Defendant Golden never had any intention of helping to ameliorate the

campaign of defamation and online harassment that he had set in motion.  In fact, his offers to

help were merely further examples of his efforts to inflict severe emotional distress upon Carly.

**The Second Tortious Interference**

71.    In October 2016, Carly managed to receive an offer of employment with St.

Clare's Hospital in Denville, New Jersey.

72.    Carly worked at St. Clare's without any notable incidents or disciplinary

actions until June of 2017.

73.    On June 28, 2017, a patient named Sarah McClatchy ("Defendant McClatchy")

presented for a CT scan, which Carly was to administer.

74.    Carly was never alone with Ms. McClatchy; throughout their entire interaction,

Carly's colleague Greg Feigenbaum ("Greg") was also in the room.

75.    At one point both Carly and Greg had to leave the room briefly as part of the

normal procedures.

76.     When Carly returned, Defendant McClatchy had disappeared and apparently left the premises.

77.     Until that time, the appointment and scan had been unremarkable.

78.     Both Carly and Greg had to file reports on the unusual occurrence; neither of them had any idea why Defendant McClatchy had left abruptly.

79.     On August 11, 2017, Carly was notified by the hospital's management that she was being terminated.  She was informed that the hospital had received a complaint alleging that Carly "exhibited unprofessional behavior towards her during the exam."

**Defamatory Review**

80.     On or about August 2017, Defendants authored or directed the authoring of a harassing and defamatory user review of Plaintiff on Google.com (the "Defamatory Review"), concerning Plaintiff.

81.     Specifically, the Defamatory Review stated as follows:

> "I was taken to the Radiology office, Carly Avraham was the technician, she was left alone with me in a room and she touched me in an inappropriate manner and hit on me. She wrote down her texting name, and told to text her and it would be a secret.  I consider that hitting on me.  I reported this to HR, HR contacted me but I have not seen them take any action except "investigate."  I have not received even an apology.
>
> OMG, I googled Carly Avraham and she is involved in all these scams with healthcare records."

82.     The Defamatory Review is entirely fabricated. Defendants directed the dissemination of the Defamatory Review in such a fashion that no reasonable person would believe that the statements made therein were opinion, but rather statements of fact about

Plaintiff.

83.     The above statements are knowingly and materially false, and were made to defame Plaintiff.

84.     Upon information and belief, Defendants published the Defamatory Review for the sole purpose of harming Plaintiff's reputation and causing her to lose her job and/or revenue, as the statements in the Defamatory Review bear directly on Plaintiff's services, professionalism, business practices, and treatment of patients—all key aspects of Plaintiff's profession.

85.     It is not possible that Plaintiff engaged in the conduct alleged in the Defamatory Review. Carly had done none of these things; she had not even been alone with Defendant McClatchy for any period of time.  Until Defendant McClatchy had abruptly disappeared, the CT Scan procedure and the interaction between Carly and Defendant McClatchy had been unremarkable.

86.     Accordingly, the Defamatory Review is undeniably false.

87.     Defendants caused to be disseminated the above-referenced Defamatory statements as part of an intentional, malicious and systematic campaign to defame Carly and interfere with her contractual relationships with current and prospective employers, by leading others to believe that Carly had engaged in unprofessional and/or impermissible conduct in the workplace.

88.     On information and belief, Defendant McClatchy had a previous association with Defendant Golden, and Defendant Golden compensated or encouraged her to assist him in defaming Carly and interfering with her professional life.

**Harassment and Invasion of Privacy Continuing to the Present**

89.     In frustration and fearing for Carly's livelihood, Jenny again reached out to

Defendant Golden in late 2017, imploring him to leave her alone and to remove the various defamatory posts from the internet.

90.     In response, Defendant Golden was characteristically both menacing and contrite, writing, on March 7, 2018: "she is lucky to be walking without crutches [sic]. I suggest she start looking at her behavior and she needs to account for it. I will account for mine and I accept what I did was sick and malicious."

91.     To the present, Defendant Golden continues his effort to defame and harass Carly online.

92.     Upon information and belief, Defendant Golden still regularly posts defamatory, invasive and injurious material about Carly online.

93.     Upon information and belief, Defendant Golden also adds Carly's email addresses to email distributions for pornographic material in his efforts to harass her.

94.     To date, Defendant Golden's campaign to harass, defame and cause emotional distress to Carly has had the desired effect.  Carly has suffered frequent bouts of depression, fueled by despair about her beleaguered professional life, her powerlessness, and the shame and embarrassment she has been caused.

95.     She remains justifiably paranoid, avoiding all social media outlets, hiding any semblance of a public profile, and having to pre-emptively warn her current employer that she has been the longtime target of a malicious campaign to destroy her career and make her life a nightmare.

## COUNT I
### Copyright Infringement under the Copyright Act (17 U.S.C. § 501 et seq.)
### (as to Defendant Golden)

96.     Plaintiff repeats and incorporates herein by reference each and every one of the

allegations contained in paragraphs 1 through 95, with the same force and effect as if set forth in detail herein again.

97.     The photograph attached hereto as Exhibit B is the subject of Copyright Registration No. VA 2-105-14, effective date June 05, 2018, and is the intellectual property of the Plaintiff. A copy of the Certificate of Registration is attached hereto as Exhibit C.

98.     Defendant Golden has infringed upon Plaintiff's copyright.

99.     The infringement of Plaintiff's copyrighted materials has been willful, intentional, and in total disregard of Plaintiff's copyright, in violation of 17 U.S.C. § 501 et seq.

100.     Defendant Golden did not have license, authorization or the consent of Plaintiff to use the photograph.

101.     Defendant Golden copied the photograph off of Plaintiff's Facebook profile.

102.     As a result of Defendant Golden's infringement of Plaintiff's copyright and exclusive rights under copyright, Plaintiff is entitled pursuant to 17 U.S.C. § 504 to either disgorgement of profits and recovery of actual damages, or statutory damages.

103.     Plaintiff is further entitled to recovery of its attorneys' fees and costs pursuant to 17 U.S.C. § 505.

104.     Defendant Golden's conduct is resulting in irreparable damage to Plaintiff and Plaintiff has no adequate remedy at law.

105.     Defendant Golden's infringement of Plaintiff's copyrights has damaged, and is continuing to damage, Plaintiff in an amount to be determined at trial.

106.     Accordingly, Plaintiff seeks an order under 17 U.S.C § 502 enjoining Defendant's copyright infringement.

107.     By reason of the foregoing, Plaintiff is entitled to injunctive relief, either actual

or statutory damages, attorneys' fees and costs, and further relief as the Court deems just and proper.

## COUNT II
### Tortious Interference with Contractual Relations
### and Prospective Contractual Relations
### (as to both Defendants)

108.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 95, with the same force and effect as if set forth in detail herein again.

109.     Plaintiff had existing contracts with her employers and reasonably expected that these contractual relationships would continue into the future.

110.      Defendants knew of Plaintiff's contracts with her employers.

111.     By the wrongful conduct described above, Defendants intentionally and improperly interfered with Plaintiff's contract with her employers and did so with the intent and purpose of damaging Plaintiff's business and professional reputation.

112.     Defendants' interference caused Plaintiff's employers to terminate her and to cease doing business with her.

113.     Other potential employers were deterred from doing business with Plaintiff due to Defendants' interference—which was Defendants' precise intention.

114.     As a result of Defendants' actions, Plaintiff has been and continues to be damaged in an amount to be determined at trial.

115.     Plaintiff has also suffered and will continue to suffer irreparable harm in the form of damage to her reputation as a result of Defendants' conduct described herein.

116.     While an award of damages may be adequate to compensate Plaintiff for the

loss of her employment, an award of damages will not be adequate to compensate Plaintiff for the damage to her reputation caused by Defendants.  Plaintiff has suffered and will continue to suffer irreparable harm unless preliminary and permanent injunctive relief is granted.

## COUNT III
### Intentional Infliction of Emotional Distress
### (as to Mr. Golden)

117.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 95, with the same force and effect as if set forth in detail herein again.

118.     Defendant Golden's willful and malicious defamation, his campaign of online harassment and intrusion directed to the Plaintiff and her friends and family, and his targeted efforts to deprive Plaintiff of her livelihood, were all made intentionally and with a desire to cause severe emotional distress.

119.     The manner by which Defendant Golden sought to harm Plaintiff, including the steps described herein via the dissemination of private facts and defamatory statements to the Plaintiff's friends and family as well as the public at large, and the campaign of derisive, manipulative and insulting comments targeted to the Plaintiff, was extreme and outrageous.

120.     Defendant Golden's conduct was without any just cause or provocation, was extreme, outrageous and utterly intolerable in a civilized community and was otherwise conduct that exceeded all reasonable bounds of human decency.

121.     As a result of Defendant Golden's past and continued wrongful acts, including, *inter alia*, assailing Plaintiff's professional reputation, exposing her sexuality, insulting her physical appearance and ethnicity, Plaintiff has experienced extreme emotional distress, mental anguish and personal humiliation.

122.     As a direct and proximate result of Defendant Golden's past and continued wrongful acts, Plaintiff has been materially and substantially damaged in an amount to be proved at trial, including compensation for Plaintiff's time, effort and attorney's fees.

**COUNT IV**
**Intrusion Upon Seclusion**
**(as to Mr. Golden)**

123.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 95, with the same force and effect as if set forth in detail herein again.

124.     In directing and carrying out the sustained effort to embarrass, defame and publicize private facts about the Plaintiff described herein without the consent of the Plaintiff, Defendant Golden intentionally intruded upon the Plaintiff's solitude or seclusion.

125.     The Plaintiff did not consent to the Defendant Golden's intrusion.

126.     Defendant Golden's intentional intrusion on the Plaintiff's solitude or seclusion would be highly offensive to a reasonable person.

**COUNT V**
**Defamation**
**(as to both Defendants)**

127.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 95, with the same force and effect as if set forth in detail herein again.

128.     Defendants have intentionally made knowingly false statements of fact about Plaintiff and Plaintiff's services via letters (to her employers), online comments, complaints boards, fliers, social media, text messages and emails.

129.     Additionally, and/or alternatively, Defendants have espoused and/or concurred

in the charges made by others to launch an unwarranted personal attack of their own against Plaintiff and upon Plaintiff's honor, dignity and standing in the community.

130.     Defendant Golden falsely accused Plaintiff of, *inter alia*, fraud, HIPAA violations, selling patients' confidential medical records, and selling drugs.

131.     Defendant McClatchy falsely accused Plaintiff of sexual and professional misconduct.

132.     The aforementioned statements were false when made and Defendants knew or should have known that the statements were false when made.

133.     These statements were published to third parties in this district and across the Internet.

134.     Defendants have no privilege to assert the false and disparaging statements.

135.     These statements were made maliciously and willfully, and were intended to cause harm to Plaintiff's personal reputation.  The statements were made with reckless disregard for their truth or falsity or with knowledge of their falsity and with wanton and willful disregard of the reputation and rights of Plaintiff.

136.     The aforementioned statements where made of and concerning Plaintiff, and were so understood by those who read or heard Defendants' publication and/or utterance of them.

137.     Defendants' false statements of fact tend to injure Plaintiff in her business trade and/or profession. Defendant Golden's statements also falsely accuse Plaintiff of the serious crimes and regulatory violations.

138.     As a result of Defendants' acts, Plaintiff has suffered irreparable damage to their reputations and further damages in an amount to be determined at trial.

As a result of the willful and malicious nature of the defamation, Plaintiff is entitled to punitive damages.

## COUNT VI
## Publication of Private Fact
## (as to Mr. Golden)

139.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 95, with the same force and effect as if set forth in detail herein again.

140.     Defendant Golden publically disclosed details about Plaintiff's sexual orientation.

141.     Plaintiff's sexual orientation was a private fact.

142.     Defendant Golden knew or should have known that disclosure of this fact would be injurious to Plaintiff.

143.     Plaintiff had a reasonable expectation that this information would remain confidential and that Defendant Golden would not violate her right to privacy.

144.     Dissemination of such facts are offensive to a reasonable person.

145.     There was no legitimate public interest in being apprised of the facts publicized

146.     As a result of Defendant Golden's publication of Plaintiff's sexual orientation, Plaintiff suffered damages in the form of economic loss, damage to her reputation, and severe emotional distress.

## COUNT VII
## False Light Invasion of Privacy
## (as to Mr. Golden)

147.     Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 95, with the same force and effect as if set forth in

detail herein again.

148.   Defendant Golden gave publicity to a matter concerning Plaintiff that Defendant Golden knew was false.

149.   Defendant Golden either knew that the publicized material was false and would place the Plaintiff in a false light or acted with reckless disregard as to whether the publicized defamatory statements were false and the false impression created by the publicized defamatory statements.

150.   The defamatory statements made by Defendant Golden so misrepresented the Plaintiff's character, history, activities and/or beliefs that a reasonable person in the Plaintiff's position would find the material highly offensive.

151.   The publicity caused by Defendant Golden's defamatory statements was the cause of injuries, damages, and/or losses sustained by the Plaintiff.

## <u>COUNT VIII</u>
### Cyberharassment under Florida Statutes Section 784.0485
### (as to Mr. Golden)

152.   Plaintiff repeats and incorporates herein by reference each and every one of the allegations contained in paragraphs 1 through 95, with the same force and effect as if set forth in detail herein again.

153.   Defendant Golden has engaged in the "willful[], malicious[], and repeated[] follow[ing], harass[ing], or cyberstalk[ing][of] another person." § 784.048(2).

154.   Defendant Golden has communicated, words, images, or language by or through the use of electronic mail or electronic communication, directed at the Plaintiff. causing substantial emotional distress to that person and serving no legitimate purpose.

155.   By reason of the foregoing, Plaintiff is entitled to injunctive relief and further

relief as the Court deems just and proper.

**WHEREFORE**, Plaintiff prays for judgment against Defendants awarding Plaintiff:

1.  Enter a judgment declaring that Defendant Golden's conduct violates the Copyright Act (17 U.S.C. § 501 et seq.) and Florida Statutes Section 784.0485.

2.  Enter a judgment declaring that Defendants' conduct constitutes tortious interference;

3.  Enter a judgment declaring that Defendant Golden's conduct constitutes intentional infliction of emotional distress;

4.  Enter a judgment declaring that the Defendants' conduct constitutes slander, libel and/or defamation;

5.  Enter a judgment declaring that Defendant Golden's conduct constitutes publication of private fact;

6.  Enter a judgment declaring that Defendant Golden's conduct constitutes false light invasion of privacy;

7.  Award Plaintiff compensatory damages according to proof at trial but in an amount not less than $2,000,000.00;

8.  Award statutory damages, including $30,000 per work infringed upon under the Copyright Act, 17 U.S.C. § 504;

9.  Award Plaintiff punitive damages due to Defendants' willful and wanton behavior;

10. Enter a temporary and permanent order, enjoining Defendants from publishing the false statements identified above in relation to Plaintiff, or any false statements similar thereto, and directing Defendants and their respective agents, servants, employees, successors and assigns, and all other persons acting in concert with or in conspiracy with or affiliated with Defendants, to remove, delete, or otherwise disable such videos, links and posts;

11.     Award Plaintiff reasonable attorney's fees, costs and disbursements in this civil action;

        and;

12.     Enter such other and further relief to which Plaintiff may be entitled as a matter of law or

        equity, or which the Court determines to be just and proper.

Dated:          July 18, 2018
                Brooklyn, New York

                                LEWIS & LIN, LLC

                                By:   /s/ David D. Lin
                                David D. Lin, Esq.
                                45 Main Street, Suite 608
                                Brooklyn, NY 11201
                                Tel: (718) 243-9323
                                Fax: (718) 243-9326
                                David@ilawco.com


                                *Attorney for Plaintiff Carly Avraham*

## **EXHIBIT LIST**

**Exhibit A** – **Defamatory Flier with Infringing Image**

**Exhibit B** – **Copyright Work**

**Exhibit C** – **Certificate of Copyright Registration**